Per Curiam:
This is a suit to recover alleged overpay-ments of income taxes for the year 1959, arising from the capital gain on the sale of real property, the interest in which was received by plaintiffs as beneficiaries of a will. The issue involved is the determination of the fair market value of the subject property as of March 3, 1958, the date of the testator’s death, for use in computing plaintiffs’ capital gains resulting from the sale and the taxes due thereon. Plaintiffs would like to have the value established at $273,000 which was the market value a year later and the contract price of the- sale. Plaintiffs’ evidence suggests a valuation of $222,000. Defendant’s valuation is $166,000. Trial Commissioner Marion T. Bennett filed his report of findings of fact on March 15,1965, wherein it is found that the fair mar- *630 feet value of the subject property as of March 3, 1958, was $185,000 on which base the amount of the tax is subject to computation. The parties have filed elections to submit the case on the commissioner’s report without exceptions and briefs pursuant to Rule 62 and the case is thus submitted to the court without oral argument. Upon consideration of the pleadings filed herein and the findings of fact of the trial commissioner, the court approves the said findings and concludes that plaintiffs are entitled to recover in accordance therewith and judgment is entered for plaintiffs with the amount of recovery to be determined pursuant to Rule 47(c).
FINDINGS 03? FACT
The court having considered the evidence and the report of Trial Commissioner Marion T. Bennett, makes findings of fact as follows:
1. Plaintiffs Orville X). and Patsy S. Eger (1) and Ruth E. Mullins (2) are residents of Polk County, Florida, and bring this action for the recovery of Internal Revenue taxes alleged to have been erroneously and illegally assessed and collected. The overpayments alleged are for the calendar year (tax year) 1959. The action is timely filed, arises out of the same transactions and occurrences, and presents common questions of law and fact as to the claims of the plaintiffs.
2. On or about March 17, 1960, plaintiffs Orville D. and Patsy S. Eger, husband and wife, filed a joint individual income tax return for the year 1959 and paid taxes as reflected therein in the sum of $12,369.94. On or about April 14, 1960, plaintiff Ruth E. Mullins, a widow, filed her individual income tax return for the year 1959 and paid taxes as reflected therein in the sum of $6,943.24. Plaintiffs’ returns were filed with, and the sums were paid to the District Director, Internal Revenue Service, United States Treasury Department, Jacksonville, Florida.
3. Plaintiffs were beneficiaries named in the will of Magdalene S. Eger, who died a resident of Polk County, Florida, on March 3,1958. By virtue of the will each of the plaintiffs Orville D. Eger and Ruth E. Mullins was devised and re *631 ceived an undivided two-sixths’ interest in the following described property in Polk County:
E i/2 of NW % of SE % of Sec. 17, T. 31 S., R. 26 E., also known as Eger grove No. 1.
W i/2 of NE % of SW % of Sec. 8, T. 31 S., R. 26 E, also -known as Eger grove No. 4.
S 1/2 of SE y4 of NE 14 of Sec. 20, T. 31 S., R. 20 E., also known as Eger grove No. 5.
4. For the purposes of the federal estate tax on the estate of Magdalene S. Eger, deceased, the above-described property was determined to have a fair market value of $127,750 as of March 3, 1958. The estate tax became due June 3, 1959, and has been paid as assessed. None of the plaintiffs was an executor, administrator, co-executor or co-administrator of the estate nor did any of the plaintiffs participate in or control the determination of the fair market value of the property for federal estate tax purposes.
5. On March 26,1959, plaintiffs, together with the owners of the other interest in the property, contracted to sell the property on an installment basis for the sum of. $273,000 to Bernard S. Varn, .agent for himself and David H. Varn, Jr., Mary V. Fort, Nancy V. Bevis and Fidelia V. Jahns, together with all improvements on the property except any part of the 1957-1958 citrus fruit crop that may have been pn the citrus trees on March 3,1958. The purchasers paid $113,500 in cash and the remainder, $159,500, was to be paid ratably over 5 years. The purchasers were members of the .Varn family which owned 1,500. acres of citrus groves and a .controlling or substantial interest in two packing houses which had been buying, prior to March 3, 1958, some of the fruit from the three Eger groves. The Varn family owned groves contiguous to each of the Eger groves and shared water with the Eger groves. The sales contract was closed June 9,1959.
6. In their respective individual income tax returns for the year 1959, plaintiffs computed their respective capital gains on the sale of the property by using as its unadjusted basis the sum of $127,750. After deducting therefrom the depreciation taken and adding expenses of the sale, the former owners realized a net profit of $148,592.75, the profit to each of plaintiffs thus computed being, respectively,, two-sixths *632 thereof, or $49,530.91. Plaintiffs Orville D. Eger and Ruth E. Mullins each collected $22,666.66 during the tax year 1959.
7. The amended 1959 return of Orville D. and Patsy S. Eger reflected an overpayment of income taxes in the sum of $3,584.36 and a claim for refund in that amount was duly filed on or about November 7,1960, with the District Director, Internal Revenue Service, Jacksonville, Florida. The amended 1959 return of Ruth E. Mullins reflected an overpayment of income taxes in the sum of $3,921.78. A claim for refund in the amount of $3,018.52 was duly filed by plaintiff Mullins on or about December 16,1960, with the District Director. The Director mailed notice of disallowance in full of the Eger claim on February 9,1962, and a similar notice of disallowance in full of the claim of Ruth E. Mullins was mailed to her by the Director on December 28, 1961.
8. The March 3, 1958, fair market value of the above-described property inherited by plaintiffs from Magdalene S. Eger, as finally determined by this action, is the unadjusted basis for determining plaintiffs’ gains on the sale of such property.
9. The three 20-acre groves (hereinafter sometimes referred to as the Eger groves) were known as groves Nos. 1, 4 and 5. They are not contiguous. They are located about 10 miles northeast of the town of Fort Meade, Florida, on a long ridge in the section of Polk County known as the Lake Hendry Section. There is access to Eger groves Nos. 1 and 5 by a paved road and to grove No. 4 by a clay road. They are each bordered on three sides by other citrus groves. The soil hi the groves is a Norfolk sand, a very heavy rich soil that does not contain white sand which is undesirable for citrus. All of the trees had been budded on virus-free rough lemon rootstock and none contained burrowing nematodes or had signs of disease. The groves had been fertilized, sprayed, irrigated and otherwise cared for in accordance with the top cultural practices of the time. Each grove had a permanently installed underground waterline connected to a deep well for irrigation purposes. Groves Nos. 1 and 4 were furnished water from a neighbor’s well. Grove No. 5 had its own deep well. The groves are from 190 to 220 feet above sea level and each grove has excellent air and water drainage. *633 For this reason tlie trees were not as adversely affected by the freeze in the winter of 1957-1958 as others less favorably situated. All of plaintiffs’ citrus trees were about 35 years old, except the resets and Jaffa orange trees on Eger grove No. 4. The Jaffas were about 15 to 17 years old. As of March 3,1958, the subject properties would bring the greatest financial return in the foreseeable future if they were used for the production of citrus. This is known as the “highest and best use” of the subject properties.
10. As of March 3, 1958, the three Eger groves differed somewhat as to numbers and types of citrus trees, as follows:
Eger grove No. 1 had approximately 143 Marsh grapefruit trees (2.5 acres), approximately 668 to 680 Valencia orange trees (11.9 acres) and about 334 midseason orange trees (6.6 acres). The trees on this grove were single set in rows 25 by 30 feet.
Eger grove No. 4 had 925 Valencia and 650 Jaffa orange trees. The Valencia trees on this grove were double set in rows 17 by 25 feet and the Jaffa trees were set in rows 25 by 25 feet. There were 10 acres of Valencias and 10 of J affas.
Eger grove No. 5 had approximately 141 Marsh grapefruit trees (1.5 acres), 1,668 Valencia trees (17.7 acres) and 75 midseason orange trees (.08 acre). All of the trees on this grove were double set in rows 17 by 25 feet. .
11. The “set” is the distance between the trunks of trees in a grove. The set of the trees in the Eger groves has been described above. A “single set” of 25 by 30 feet would mean fewer trees in a grove than where the set was double which would be the case of a grove with trees as close as 17 by 25 feet. This language does not mean that double-set trees are necessarily twice as close as those single set. The Eger groves had both types of sets. Experts differ about the relative merits of sets. It is easier to cultivate and fertilize single-set trees. Double-set groves require more water or irrigation and it is necessary to hedge or trim them. But, the thick double-set groves will stand more cold. Double-set groves, of course, may produce more fruit. Most of the trees in the Eger groves were double set.
*634 12. Between 30 and 35 years the average citrus grove begins to meet the problems of old age. Of approximately 4,604 trees in plaintiffs’ groves, 3,954 were of this age. Groves of such age may enjoy good health but cost more to maintain if production is to be kept high. This is especially true of double-set groves which will require hedging and more water, spray, cultivation and fertilizer. During the 1957-1958 season, the cost of taking care of the average Florida citrus grove was $194.52 per acre. A professional manager and advisor on citrus grove operation, who was advisor on the Eger groves for about 10 years to 1958, had recommended to the owner that after 1952 to maintain production on account of the age of the trees, practices should be adopted which would cost annually, exclusive of hedging, about $400 per acre. He did not know whether such a sum was expended. A purchaser of plaintiffs’ groves agreed that they would require periodic hedging within 4 years after 1958. Plaintiffs’ valuation expert placed the reasonable cost of caretaking of plaintiffs’ groves at $300 per acre. The evidence does not demonstrate what the expense actually was nor does it show any decline in production of the Eger groves due to want of adequate care or for reasons other than weather.
13. The citrus fruit cycle begins with a flower or bloom late in January, February or early in March. In late March or in April most of the bloom falls off the trees and the fruit is said to have set when this occurs. Grapefruit is harvested from September on; midseason oranges, such as Jaffas, are harvested from about December to February; Valencia oranges are harvested from either February or March to July. For several months each year there are two crops on the Valencia trees, a mature crop about to be harvested and a maturing crop to be harvested approximately a year later.
14. Florida citrus fruit and groves are subject to hazards, including hurricanes, tornadoes, freezes, lightning, drought, hail, bisects, and disease. After a freeze the trees usually are shocked into a bloom, sometimes coming on a month ahead of the usual time. But, until a crop is well set there is not much that can be told about it.
15. The Eger groves came through the 1957-1958 winter freeze with very little damage to the trees. They had a heavy *635 green foliage, little twig damage and little leaf drop. However, according to the regulations of the Federal Crop Insurance program, 50 percent of the mature fruit on the trees was injured by that freeze. On trees not carrying a mature crop as of March 3, 1958, there was a heavy bloom but the crop thereon had not yet set.
16.The schedule below sets forth the best evidence as to the number of boxes of citrus fruit produced on Eger groves Nos. 1, 4 and 5 during the specified citrus seasons:

17.The approximate average of boxes of fruit per tree produced on the three groves for the four seasons 1954-1955 through 1957-1958 was as follows:

18.Some citrus fruit is purchased from grove owners during January to March of each year, the fruit to be harvested the following September. Such practice is uncommon. The bulk of a crop is bought from May to August annually. The factors which determine when fruit is purchased are demand, price and individual judgment. There is less risk from weather, disease, and insects the closer a crop is purchased to *636 its maturity. The earlier a crop is bought, the greater the risk and the greater the discount the buyer will make on the price of the fruit. Such discounts for the risk of early purchase run as much as 50 to 60 percent.
PlaiNtipes’ Valuation
19.Plaintiffs claim that the fair market value of the subject properties on March 3, 1958, was not less than what it sold for 1 year later in March 1959, to wit: $273,000. The evidence offered by plaintiffs’ valuation expert placed the fair market value on March 3,1958, at $222,000. This figure was allocated to each grove as follows:
Eger grove No. 1_$76, 500
Eger grove No. 4_ 62, 000
Eger grove No. 5- 83, 500
20. Plaintiffs’ valuation expert was a registered real estate broker and member of the American Institute of Real Estate Appraisers. He had appraised approximately 500 Florida citrus groves over the past 12 years during which he had been in the real estate business. Approximately 95 percent of his citrus appraisals were performed subsequent to March 3,1958. He had no experience in such appraisals in the Lake Hendry Section surrounding the subject properties and had no experience as an owner or manager of citrus groves. He had extensive experience in appraising property for the state for road right-of-way acquisitions and in appraisals for attorneys, individuals and lending institutions. Plaintiffs’ expert examined the subject groves in December 1963 and April 1964. He relied upon the advice of adjoining grove owners regarding the condition of plaintiffs’ groves as of March 3, 1958.
21. Plaintiffs’ expert relied on a capitalization of income method of determining the market value asserted. That method is applied in this case as follows:
(a) The average yearly number of boxes of fruit per acre of each variety that the subject groves produced during the four seasons 1954-1955 through 1957-1958 is multiplied by *637 the average projected per box price expected by reliable citrus statisticians for the five seasons subsequent to 1957-1958 and (b) the average net yearly income thus determined is reduced by an estimated yearly production expense (caretaker, cultivation, iiTigation and real estate taxes) of $300 per acre, and (c) the resulting net figure is multiplied by five.
22. Hie evidence does not establish a yearly fruit box price as of March 3, 1958. Plaintiffs rely on an anticipated tree price per box arrived at in late 1958 by an economist for the Florida Citrus Mutual, a grower-packer-canner organization with 95 percent of the citrus industry as members. This projected price was $2.50 per box for Valencia oranges, $2 per box for midseason oranges and $1 per box for Marsh seedless grapefruit. In view of the freeze damage to the 1957-1958 citrus crop in Florida, a reasonably informed citrus man could have accurately anticipated that for a few years after the freeze there would be high prices resulting from the reduction in production.
23. The multiplier of five (capitalization at 20 percent) used hi the application of plaintiffs’ valuation formula, was arrived at as a result of inquiries made of grove owners by plaintiffs’ expert during 1958 and 1959 and of sales made in April and July 1959 and in 1960, 1961 and 1962 in Polk and Pasco Counties. It was the opinion of plaintiffs’ valuation expert that these owners would and did pay anywhere from four to six times the potential net income per acre. The plaintiffs’ evidence does not establish what was paid in sales for good, relatively undamaged groves, such as the Eger groves, on or about March 3, 1958. Due to heavy production of fruit prior to the 1957-1958 freeze, sales' of good groves were depressed. After the freeze there were few sales of good groves for several months because people expected grove prices to go up but were uncertain to what extent. Sales relied on by plaintiffs as an element of their valuation formula are not comparable to. the Eger groves because of differences in time, location, age of trees, variety of trees, irrigation facilities, location and market condition for the crops.
*638 DEFENDANT’S VALUATION
24. Defendant’s principal expert witness on valuation was a recognized appraiser, a resident of Polk County, Florida, for 40 years, a man who had engaged in the citrus business as a planter, manager, owner of groves and a buyer for packing companies, a member of and an instructor for the American Institute for Peal Estate Appraisers, a licensed real estate salesman in Polk County since 1930 and head of his own real estate and appraisal firm. Prior to March 3, 1958, he had appraised 2,000 acres of citrus within a 15-mile radius of the subject properties, approximately 10,000 acres of citrus in Polk County and 18,000 acres of citrus outside that county. He was personally familiar with the Eger groves and surrounding property in March 1958. As was true of plaintiffs’ valuation expert, this witness had qualified as such in other lawsuits in the courts in Florida. He had made appraisals for the state road department and many corporate and individual clients.
25. Defendant claims that the fair market value of the subject properties on March 3,1958, was $166,000. Defendant grounds this valuation on the opinion of its valuation expert who valued the groves as of said date as follows:
Eger grove No. 1_$56, 000
Eger grove No. 4_ 50,000
Eger grove No. 5_ 60, 000
26.Defendant has used two variations of the market data approach and a capitalization of earnings approach to determine the fair market value of the subject properties as of March 3, 1958. These approaches are, in summary, as follows:
Market Approach I. Under this method of valuation plaintiffs’ expert ascertained a per-acre value for each variety of citrus on the subject properties from the sales of groves believed to be comparable. The method entailed allocating the total sales price for each comparable grove among the varieties of citrus found on the grove, according to the number of trees of each variety. Other factors considered were *639 set, age, bearing, surface, soil, rootstock, condition, management practices and location of the groves. The allocation was based on defendant’s expert’s knowledge of the relative values of the various types of citrus and the sales price of unmixed groves, i.e., groves with only a single variety of citrus. This was described as the “distributed sales price method.”
Market Approach II. Comparison is made on an overall basis of each Eger grove with other citrus groves which had been sold prior to March 3, 1958 (which defendant’s expert felt had physical characteristics very similar to one or all of the Eger groves). The sales price was then weighed to reflect its desirability in comparison with the Eger grove to which it was considered similar.
Income Approach. By this valuation method the expected production per year and the expected price per box are used to determine the expected earnings. That computed figure is then capitalized. Data compiled by recognized authorities is used to determine the average cost of operating groves and the average past price of citrus fruit which in turn serves as the basis for projections of fruit production and prices.
27. Some of the saxes defendant’s valuation expert felt were of property comparable to the subject property and upon which, among other things, he based his opinion of the value of the subject property are, in summary, as follows:

*640

*641

*642 28. In using Ms income approach or capitalization of earnings method of valuation, defendant’s expert estimated that the production of the subject groves would go down because of the age and set of the trees. He did not rely on actual past expenses and receipts of the subject properties for they are not in the record. He assumed that the Eger groves would have average care which in the 1957-1958 season cost $194.52 per acre in Florida. This figure was rounded off to $200 per acre as an applicable expense figure.
Defendant’s expert was of the opinion that as of March 3, 1958, a reasonable estimate of the yearly fruit box prices to be gained over the remaining economic life of the trees would be equal to the average price obtained for the particular varieties over the previous 10 years which were alleged to include both good and poor years.
Defendant’s evidence was that raw, undeveloped citrus land had a fair market value of $500 per acre and that the average investor in such undeveloped land would require a return of 8 percent on his investment. A 20-acre tract capitalized at 8 percent would give an $800 income attributable to such grove. The average investor was also represented as demanding a recapture of his investment in the trees in 20 or 25 years (the average remaining economic life of the trees), plus 15-percent interest on his money, for a total capitalization rate for the trees of 19 and 20 percent.
29. Defendant valued Eger grove No. 4 as of March 3, 1958, at $50,000. In the computation of this valuation, defendant’s expert made a comparison of the varieties on this grove with the distributed sales prices of the same varieties, or others providing a benchmark of value on groves considered comparable and which had been sold, namely, sales Nos. 2,41A and 101 heretofore noted. No Jaffas were recorded on these other sales but Hamlin oranges were considered to set an upper limit and Duncan grapefruit a lower limit for the Jaffa oranges. Sales Nos. 100 and 101 recorded Hamlin oranges at $2,400 per acre and sales Nos. 100 and 31 set the price of $1,400 per acre for the Duncan grapefruit. Pursuant to this approach, Valencia orange trees (10 acres) were valued at $2,800 per acre on the subject grove and Jaffas (10 acres) at $2,200 per acre.
*643 Using the other market approach, defendant valued the subject property at $2,500 per acre using on an overall basis the sales prices of groves Nos. 100 and 101. This gives a total of $50,000 for the 20 acres.
Employing the income approach to valuation, defendant used figures based on production resulting from the seasons 1954-1955 through 1957-1958. However, because of hedging, spacing, and the age of the trees, future production was expected to be less than past production. The future expected prices were $1.20 per box for Jaffa oranges and $1.88 per box for Valencia oranges. Part of the income — $4,800—was attributed to the Jaffas and $7,520 to the Valencias.
Total gross income_$12,320
Expense_ 4, 000
8, 320
Return on land_ 800
Net income_ 7, 520
After using a 19-percent capitalization rate and adding $10,000 for the value of the land, the total value was found to be $49,578. The defendant’s expert felt that the land had a raw value of $500 per acre and an 8-percent return was expected on the investment. The Valencia and Jaffa trees were considered to have a remaining economic life of 25 years so the return of the investment would be 4 percent each year. A 15-percerit return was expected on the total investment.
30. Defendant valued Eger grove No. 1 as of March 3, 1958, at $56,000. In the computation of this valuation, defendant’s valuation expert made a comparison of the varieties on this grove with the distributed sales price of the same varieties, or other varieties which provided a benchmark value, on groves which had been sold, namely, sales Nos. 2, 100, 101 and 31 heretofore noted. This indicated that the Valencia trees had a value of $3,200 per acre and the mid-season oranges and Marsh grapefruit a value of $2,200 per acre, or a total for the grove of $55,900. With the other market approach, defendant made a comparison of this grove on an overall basis with the sales prices of groves considered comparable, namely, sales Nos. 100 and 101, and gave the 20 acres *644 of Eger grove No. 1 a valuation of $2,800 per acre for a total value of $56,000.
Applying tbe income approach to Eger grove No. 1 defendant concluded that production on Valencia trees had begun to decline and that they had a remaining economic life of 25 years. The same future expected prices for Jaffa and Valencia oranges were used as for Eger grove No. 4. Gross income for the Marsh seedless grapefruit was estimated at $2,040. Expenses and return on'land were determined in the same manner as on grove No. 4.
Total gross income-$13,480
Expense (20 acres at $200)__ 4, 000
9,480
Return on land_ 800
Net income_ 8,680
After applying a 19-percent capitalization rate and adding $10,000 for the land, the subject grove was found to be worth $55,684. The capitalization rate of 19 percent was used since 15 percent was expected as a return on the investment and the trees had a remaining economic life of 25 years and the investment would be recaptured at the rate of 4 percent per year.
31. Defendant valued Eger grove No. 5 as of March 3, 1958, at $60,000. Using the distributed sales price approach to valuation and considering in connection therewith sales Nos. 1, 31,100 and 101 heretofore referred to, defendant set a value of $2,900 per acre for Valencia orange trees and $2,200 per acre for Marsh grapefruit and midseason oranges. Eor land and trees this came to $56,390, to which defendant added $2,500 for a well and tank on this tract, making a total value of $58,890.
Valuation of the tract on an overall basis with, the sales prices of other groves (unspecified in the record) resulted in a valuation of $2,900 per acre to which. $2,500 was added for the well and tank for a total of $60,500 for the. 20-acre tract.
By the income approach defendant estimated total gross income at $15,324, expense at $4,000 ($200 per. acre for 20 acres) and net annual estimated income at $11,324. Erom *645 this defendant subtracted $800 as a return on the land in the same manner as computed on the other Eger groves, leaving a net income of $10,524. After using á capitalization rate of 20 percent and the same figures for the valúe of raw land and expenses as used with other Eger groves, the value was determined to be $62,620. A capitalization rate of 20 percent was used because the trees in this grove were considered to have a remaining economic life of 20 years (5-percent recapture per year of the investment plus a 15-percent return on the investment).
32. As in the case of plaintiffs’ valuation, defendant’s valuation is not without its defects, including the following:
Defendant relied upon the average price of citrus fruit during the 10 years prior to the freeze whereas it could have been reasonably anticipated to be less than following the 1957-1958 season; the actual fruit production of the allegedly comparable groves relied upon by defendant was not known by defendant’s valuation expert; in one variety — Valencia oranges — the subject groves produced more than the so-called comparable groves; the sale of all groves relied on by defendant occurred prior to March 3,1958, and the additional value of the Eger groves resulting from a small amount of freeze damage was not considered; the market for sale of good groves was depressed prior to March 3,1958; sale No. 1 had freeze damage and an inferior location; the “comparable groves” were not irrigated as were the Eger groves; sets of the “comparable groves” differed from the subject groves in some cases as' did the age of the trees and the kinds of varieties of fruit; none of defendant’s comparable groves had Jaffa oranges as did plaintiffs’; defendant’s capitalization of earnings method is suspect because defendant assumed that production would decline but this was not proved; and the evidence respecting the value of raw citrus land, and the return expected on a citrus grove investment was opinion testimony not related by the evidence to specific sales. Some of these variables were recognized by defendant’s expert in making a valuation. ■ . . .
Ultimaie FINDING
33. The difference in the valuations determined as of March 3, 1958, by the parties’ expert witnesses and the evi- *646 deuce is $56,000. Plaintiffs’ evidence suggests a valuation of $222,000. Plaintiffs would like to have the value established at $273,000 which was the market value a year later. This figure, however, is not acceptable as showing fair market value on March 3, 1958, when market conditions were quite different, due principally to the effect of the 1957-1958 winter freeze. Defendant’s valuation is $166,000. The reason for this difference in valuation is the different approaches used by the experts. Basically, defendant relies on sales and prices prior to March 3, 1958, and plaintiff on such figures subsequent to said date when the market was higher. There were no comparable sales on or about March 3,1958. As noted in the primary findings, both approaches leave something to be desired in the solution of the problem with any precision. Both parties have necessarily engaged in considerable speculation. Considering the defects noted in the approaches used by the parties for valuation purposes, as well as the merits thereof, the qualifications of. the experts, the testimony of seller and buyer, the best available evidence, the weight of that evidence and the record as a whole, it is found that the fair market value of the subject property as of March 3,1958, was $185,000. On this base, the amount of the tax is subject to computation.
CONCLUSION OP LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover. The amount of recovery is to be determined pursuant to Buie 47 (c).
In accordance with the opinion of the court, a memorandum report of the commissioner and a ■ stipulation of the parties, it was ordered on November 8, 1965, that judgment be entered for plaintiffs Orville and Patsy Eger for $1,566.98, plus interest according to law, and that judgment be entered for plaintiff Buth E. Mullins for $1,529.96, plus interest according to law.